This is Wade's explanation of an explanation. Justice Overstreet has refused himself from this case, and Justice Goldenhirsch will sit in his place. And obviously Justice Goldenhirsch is not here, but he will listen to the oral argument and participate in the decision. It would be in your interest to speak up loud so they can get the recording. So if you're ready, Case 516-0239, Jones v. Sisco with Abex. May it please the Court, I'm Jim Wilder, and I represent the plaintiffs, John and Deborah Jones, and we're asking that this Court reverse and vacate the summary judgments that were entered in favor of Pneumo Abex, which is just referred to as Abex, and Owens, Illinois, by the Trial Court. This is a case that sounds like civil conspiracy. Civil conspiracy is a recognized theory of law in the state of Illinois. The Supreme Court said that in the Adcock case, which was the first asbestos case that the Supreme Court addressed in civil conspiracy, but civil conspiracy generally goes back for decades. In fact, it goes back for more than 100 years in this state. It's a theory of recovery. As the Supreme Court said in Adcock v. Brakegate, civil conspiracy is rarely susceptible of direct proof. It's instead based on circumstantial evidence, the inferences from that evidence coupled with common sense knowledge of the behavior of persons in similar circumstances. That language from Adcock has been repeated in the appellate level of the Fourth District Appellate Court, where there have been numerous civil conspiracy cases, as well as in the Supreme Court and the other civil conspiracy for asbestos decision by the Supreme Court. Let's start in the McClure case, McClure v. Owens Corning, 188, Bill 2nd, 102, a 1999 decision. This is an asbestos case. It is civil conspiracy, but the principles of summary judgment are unchanged in terms of, and in fact, I should say that I realize this Court, we're not a traveling show, but we've done this before with our U.S.S. group. That's why we visit. All the decisions cited to you by the defendants and in support of their motion for summary judgment are decisions after a trial. The opinions from the Fourth District, and I know this Court has read the briefs, there are differing opinions from the Fourth District, conflicting opinions, but those were all after a trial. McClure at the Supreme Court level was after a trial. Adcock was after the full proceeding against Owens Corning, but addressed the issues of the appellate level, whether it stated the cause of action, and addressed general principles of premises of conspiracy law at the Supreme Court level. Owens Corning had failed to comply with reduction under Rule 237. But they're all cases after a trial. We're not here on a summary judgment. Summary judgments were granted. And summary judgment is no different in an asbestos case in terms of how it should be approached. A summary judgment is a drastic remedy. This Court said in the Oliver v. D. Chandler case back in 2012 that the movement has to show it's clear and free from doubt. All permissible inferences are drawn in favor of the non-movement, and it's not allowed unless no fair-minded individual could dispute those inferences. And that's similar to the language the Supreme Court has used, as well as others in viewing courts. With that background, I want to address first ABEX. It's plain exposition that as to ABEX, the trial court, and we hit the trial court with lengthy arguments and hundreds of exhibits, but the trial court used the wrong burden, because the burden is more probably true than not. Unless you're attempting to prove a civil conspiracy solely by circumstantial evidence. If it's solely by circumstantial evidence, as the Supreme Court in McClure said, page 134, then the burden is clear and convincing evidence. And that's where you have to go direct evidence of conspiracy. Then it would have to be by clear and convincing evidence. And, in fact, it would get into the issue of the innocent construction rule, according to Supreme Court McClure. Innocent construction meaning that the evidence would need to show that it was, again, this is after a trial, that it was not as consistent with innocence as it was with guilt. But at the summary judgment level, where you draw all inferences in favor of the non-movement, whereas the burden is on the defendant, then the plaintiff suggests that drawing the, making the plaintiff prove that it's more consistent with guilt than innocence is directly contrary to how summary judgment analysis should work in a case. In addition, as to AVEX, the plaintiff's position, there is direct evidence over and beyond circumstantial evidence. Every case that you're going to look at that was cited by my office or cited by these defendants, every asbestos case, at the reviewing level, all the ones from the Fourth District, the ones from the Supreme Court, McClure, found that these companies knew and did not tell. They knew and acted the same. Parallel conduct, which the Supreme Court says can be considered as evidence of conspiracy, but if it's only circumstantial, then you need more than that in addition to the parallel conduct. And to use an example in one of the Fourth District opinions, if you just have two cars and they get together on Broadway and someone starts speeding, that could be parallel conduct that they're, you know, they're drag racing. But if you can show something beyond that, some evidence of contacts, evidence that, you know, they called each other and said, hey, I'll meet you at 10 at 27th Street or whatever. I'm from Bloomington, not Mount Vernon. Hopefully it's 27th Street. But I'll meet you there at 10, and that's where they meet and take off, and you've got something beyond parallel conduct. As to ABEX, Burgess 1, the Burgess case, was a Fourth District decision. It found that they heard the plaintiff affirm the verdict. The McClure Supreme Court decision came out, and McClure said various things. At the Supreme Court level, it asked the Fourth District to consider, again, the Burgess decision. It did. And again, he said there's direct evidence of ABEX having participated in a conspiracy, in particular of Johns Mandel and other companies, in regard to contracting for research in 1936, in which the companies required that the results of the research would be the properties of the company, a place called Saranac Lake, upstate New York. Animal experiments were conducted. In 1948, the report came back. The report said that animals got asbestosis, and one group of mice had gotten tumors. Eighty-one point eight percent had gotten tumors. And the companies required that it be excised from the report before it was then published in 1951 without any reference to the tumors or malignancies. As the court said in Burgess 2, there's direct evidence, the Fourth District said in Burgess 2, direct evidence between ABEX and these other companies of contacts, meetings, calls, you know, results. And in fact, when it was determined whether or not there would be, what would be done with the report that was received in the fall of 1948, the Johns Mandel attorney, because Johns Mandel ran things that was sort of the General Motors of the asbestos industry, or I guess maybe nowadays Microsoft or whatever, I mean, it supplied its competitors, and then it had more than a 50 percent market share in most of the markets where its competitors had products. The Johns Mandel attorney required there be a meeting at corporate headquarters where decisions would have to be made. ABEX's medical director was in Chicago. He did not want to travel there, and so ABEX asked Johns Mandel to act for ABEX at the meeting as to what should be done. And what was done was it was determined all references to cancer, tumors, malignancies would be removed. And it was also determined that the copies of the report, which were the companies that had been instructed to keep confidential, needed to be returned. And where ABEX still had its, it said it would protect it. It wouldn't release it. And Mandel's attorney said, no, it's got to get back. And the ABEX vice president said, we'll send it back. That's not two cars just racing down Broadway. That's cars where there are meetings before and there are meetings after. There's even where one, in effect, the one car tells the other one, well, you can act for me. Now, ABEX spends most of its brief going after the Saranac Laboratory results and saying there are scientific difficulties with it. And so, I would suggest that that is evidence that is not as consistent with innocence as with guilt. And so forth. And therefore, that's a conspiracy. Saranac is not the conspiracy. Our conspiracy is set forth in our complaint. It's page 33 of the record. And what we allege was the conspirators conspired and implicitly agreed to assert what was not true, that it was safe for non-toxic, asbestos was non-toxic, and failed to provide information to exposed persons. If you've got a conspiracy, you need to have an agreement. We say that's what the agreement was. They were going to expose people without telling them. And you have to have a tort or you have to have overt acts in prudence of it. The torts and overt acts are listed in the following paragraph of our complaint. And the tort is that they sold without telling them. That's alleged. That's a tort. They had knowledge and sold without telling them. They had knowledge and failed to tell their employees. That's a tort. We allege that. One of the overt acts is they also took the references out of Saranac. So even if Saranac is not a tort, because that's how the court district in Rodermo said here's why we're not going to follow Burgess. Burgess said this is direct evidence of conspiracy. In Rodermo, Justice Appleton, when writing for the court, said, well, it's, you know, he said it's an eminently fair inference that the companies didn't take it out because they wanted to protect science, but they did it to save their own skin. Because the lead attorney for Manville, when he heard of the results initially, said this is dynamite in a blind memo document. They did it to save their own skin, but since it's not a tort because the science was bad, therefore, there's in effect no harm if you take that out. If you suppress something, it's no good. Post-Rodermo, I disagree with Rodermo, surprisingly. Post-Rodermo, we attempted to address that concern. This court district said you need somebody who said this was of importance. We have reported Dr. Arthur Frank, and he's been writing for 40 years researching on asbestos, and he said whether it was tumors or not, it's scientifically of importance because it's new growth. We referenced ABEX 711. It's in our appendix. That's a letter where the initial researcher at Serenet died. When he died, he left his papers behind and was sent to another well-known physician, Dr. Lynch, who sent this outline where he says, you know, it suggested cancer in the mice. This was his proposed monograph. Lynch says it's publishable as it stands. None of that was in regard. So we included that, and with all respect to the trial court, the trial court, and that's never been addressed by the court district, the Frank testimony or the ABEX 711 Lynch letter, because the cases that have come out were tried before the decision of sort of reversing conspiracy law. The trial court said that Dr. Gardner, the original researcher, Dr. Frank says he didn't use a control. He didn't use some scientifically valid things. Therefore, that negates Frank's testimony. With all respect to the trial court, I would suggest that's for the jury to determine. Frank's testimony was not stricken. There was no bribery. His testimony is in the record that it was of scientific importance whether it was tumors or not, and so we believe that raises a genuine issue as to ABEX, and we asked the court to reverse that, reverse the summary judgment, and since my time is limited and there's two, I'll move on to OI. Owen's, Illinois. Owen's, Illinois, we have not only an argument, we have a motion to strike their statement of facts. Pages five, it's an eight-page statement of facts. Pages five through eight is four pages long, not one cite to the record in four pages. It contains references to the fact that there have been tens of thousands of cases filed in Madison County. No civil conspiracy issue has come from those attorneys. With all respect to the Madison County plaintiffs' attorneys, all I'm saying is I've practiced for 38 years in Bloomington, and I don't know what the Madison County attorneys do or don't do with regard to conspiracy. I know since 87, when I filed ADCOC, we've had civil conspiracy in the central part of the state, and I don't know how that's a fact for this court to consider what was done or not done by Madison County attorneys. And, again, I'm not knocking on their plaintiffs' attorneys, but I'm just saying that's not my, our court, our burden is clearly filed. Pages one through four has cites, but we moved to strike that, and the reason for that is it goes to the first argument by Owen's, Illinois, which says that John Jones, who started working in 69, in construction, and who testified that he worked with John's Mandrills Installation, which we say, hey, that's who's into who's without. And Owen's Corning's Installation, we say, oh, I was in a conspiracy with them, that John's Mandrills, or that Owen's, Illinois, says John Jones was not exposed with enough regularity, frequency, and proximity, the fact of the test, to Owen's Corning. We moved to strike that, saying that was never raised at all, and the response to Owen's, Illinois, was yes, it was. It's a key argument. It's in Owen's, Illinois' response is inaccurate. I read their motion for summary judgment. That's at 5473 of the record. The reply is 7939. We got the transcript of the argument that Mr. Fisher was there. Mr. Fisher never suggested that. We just talked about conspiracy. The motion for summary judgment, Owen's, Illinois, was named in counts one and two, conspiracy counts three through six, were exposure counts. Owen's, Illinois, said there was insufficient regularity, frequency, and proximity to Owen's, Illinois' own products. And, in fact, I agree, basically, the summary judgment on those counts. But as to the evidence as to Owen's Corning's products in the exposure that Testimony John gave, that's not in their motion, it's not in their reply, it's not in their argument, which is probably why they start their argument one in their brief, saying the trial court did not consider it. It was never presented to the trial court. We never had a chance to respond to the argument. It shows up for the first time in the rappellee's brief, in this case, which under the Coase, I believe it was the Coase-Dunn case, is a recent case by this district, saying if you don't raise that below, I mean, your review is demilkable, but the other side ought to get an opportunity to respond to it before we're in the middle of the appellate court, and the trial court ought to get an opportunity to have it presented to them. And if you don't do that, it's waived. So their first argument is waived, and that's why we also move to strike pages one through four of the Statement of Facts. Owens, Illinois, the court's order was very brief. It just said everybody agrees this is sort of like the Gillenwater decision, which is the only appellate decision where OI was in it as having been found guilty at the trial level, other than McClure, for years before. And I follow Gillenwater. Gillenwater, I adopt the findings and analysis of Gillenwater, and Gillenwater says that it finds Owens, Illinois was in a conspiracy with Owens Corning. You look at paragraphs, you can start at paragraph 95 through 98 of the Gillenwater decision, and then you go to 107. It talks about the scope of the conspiracy. It talks about when Owens, Illinois withdrew from the conspiracy. Owens, Illinois had a relationship with Owens Corning. It's in our briefs. Owens, Illinois decided to add asbestos insulation to its flax product line in 43 and went commercial in 48. In 53, it had Owens Corning agree to be its distributor, and between 53 and 58, Owens, Illinois made it Owens Corning's distributor. And neither of them said anything about asbestos being harmful, even though, given the record, I think is undisputed, they both knew it could be harmful, both knew it could cause disease, and we went through that in our brief. And the 4th District says in Gillenwater, we find that's a conspiracy. Owens, Illinois will get up here once they're termed and say, well, no, that's just dicta. Well, it's not dicta. That's the finding of the 4th District, because it then goes on to try to determine when did the conspiracy end in the 4th District and Gillenwater said we think it ended in 58 when Owens, Illinois sold the plant to Owens Corning. After that, Owens, Illinois could no longer stop the assembly line. Owens Corning was making it stop. The idea that he had to be able to stop the assembly line in order to be in a conspiracy is, with all respect to Justice Appleton, unfounded. Did Owens, Illinois have a reason to keep secret the risk of asbestos even after 58? First of all, in Gillenwater, the court said probably it didn't want Owens Corning to start telling people because if it did, people would, it could come back for litigation against Owens, Illinois. But beyond that, as we pointed out in our briefs, Owens, Illinois was a glass company. It could not make its product without asbestos products in the 60s and 70s because of the high heat of glass. Owens, Illinois did packaging for Owens Corning. And I took the deposition of the CEO of Owens, Illinois about almost 15 years ago now, and he was, at the time, said, you know, it's 74 was when they first started telling people in their own plants. So Owens, Illinois had a reason for asbestos remaining a viable product because that's what they needed to make their product. Owens, Illinois, in its briefs, suggests McClure considered OI and OC whether it was a conspiracy and found it was not. Again, that is inaccurate. As McClure says at page 150, the Owens, Illinois-Owens-Corning relationship in the McClure case was tangential and really wasn't determinative because the three plaintiffs in McClure all had been exposed only to Johns Manville and Newman asbestos while working for the asbestos plant in Bloomington. The other thing that both defendants sort of suggest is that, well, this high requirement summary judgment is a safeguard, Owens-Corning says, against ordinary business contact. It's not ordinary business contact to expose your workers to a toxic product that you know and to expose customers. In Burgess, the Fourth District Appellate Court said that. There is no benefit from doing that to anyone other than to the company, but there's no benefit to society. Justice Harrison, back in the McClure case where he was sent, said, you know, there's no good reason to expose people if you know and don't tell. This isn't ordinary business conduct. So, and then finally, Apex says, well, it's in our self-interest not to tell and to make money, and if it's in your self-interest, it can't be pursuant to a concert of action. Well, I presume every conspiracy is to the self-interest of the conspirators. You can argue, as we did in our reply brief, the self-interest long-term would be to a toll. I believe I'm… Thank you, Your Honor. Counsel. May it please the Court. My name is Matt Fisher. I represent Owens, Illinois. This appeal presents a narrow but important issue never before considered by this Court, whether parallel and unilateral business conduct is sufficient to support conspiracy liability in an asbestos case. Decades of asbestos litigation have not brought this issue to this Court, but the Illinois Supreme Court in McClure comprehensively analyzed virtual identical allegations against the same co-conspirators and virtually all of the evidence that is before this Court today. The McClure decision teaches both the analysis that this Court is required to conduct as well as how the specific evidence should be reviewed. At bottom, McClure teaches that the judgment below is correct and that Owens, Illinois is entitled to judgment as a matter of law. Because of the unique dangers recognized in McClure of conspiracy liability based on non-conspiratorial business conduct, Illinois law has enforced procedural and substantive safeguards. I would like to focus on one of each today. First, I'd like to talk about the clear and convincing evidence standard, and secondly, I'd like to talk about the agreement element of the civil conspiracy cause of action. Plaintiff's case against Owens, Illinois relies purely on circumstantial evidence of agreement. There is no dispute about that. As a result, it is clear that the clear and convincing evidence standard and its corollary to innocent construction rule would apply at trial on the merits. Plaintiff argues that the summary judgment stage is too soon to apply a clear and convincing standard, but Judge Hudson was correct to apply it at that stage. In Reed v. Northwestern Publishing, our Supreme Court held that the substantive standard at trial on the merits applies to a summary judgment decision or a decision on directed verdict. In Fooden v. Board of Governors, our Supreme Court wrote that the standard on directed verdict is the same as the standard at summary judgment. And, of course, the directed verdict standard is the same as the JNOV standard. And in McClure, which was a JNOV decision, as Mr. Wilder pointed out, the Supreme Court applied the clear and convincing standard and mandated the application of the innocent construction rule. It is not correct, as Mr. Wilder urges, that the application of the clear and convincing standard at the summary judgment stage denies the non-movement of the benefits of doubts in the evidence. Or that it denies the non-movement of the benefit of the reasonable inferences to which the non-movement is entitled. Not all inferences, but the reasonable inferences. Reasonable, in this case, of course, being defined by the innocent construction rule. The court's role is to determine whether or not there is an issue for the fact finder to decide. That was Judge Hudson's role at the trial court level, and because we are at JNOV overview here, it is also this court's role. The court can do that applying the clear and convincing rule. That's what Reed v. Northwestern Publishing holds. The court simply needs to determine whether or not there is an issue to be decided by the fact finder. Not to determine any facts, but simply determine whether or not there is an issue. Civil courts and criminal courts do that across the state of Illinois every day. And they do it when the burden is a preponderance. They do it when the burden is beyond a reasonable doubt. And they can do it, in this case, when there is clear and convincing as the applicable burden. It is simply an issue of finding out whether or not there is a fact issue to decide. The Fourth District decisions, McClure, they come out the same way. There is no fact issue to be decided here. It is not necessary to impanel a jury, have them sit through a multi-week trial, when the result would be preordained at the directed verdict or JNOV time. That's what Plankton urges here. Have the trial, hold back on clear and convincing until after the trial, even though we all know, as a result of McClure and the other decisions, that that result then would require judgment as a matter of law for the defendants. Clear and convincing standard governs this case, including at the summary judgment stage. I'd like to move now to, with clear and convincing, what is the evidence of an agreement involving my client, Owens, Illinois? There is no evidence whatsoever of who, on behalf of Owens, Illinois, did the voluntary and intentional acts necessary to form or ratify an agreement. There is absolutely no evidence of with whom that person at Owens, Illinois, or people at Owens, Illinois, agreed. There's no evidence of when this agreement was reached or where or how or to what. There is no evidence of the scope of or the duration of the agreement. There are allegations, and those aren't enough at this stage. There is no evidence. There's no evidence that an agreement was ever enforced. There is no evidence of an exchange of mutual assurances of a common action. At most, as in Clure, plaintiffs offer a collection of independent yet parallel actions that are not connected by an agreement. We point out the absence of that evidence in our facts section. That is one of the reasons why there are not citations to the record, because there is no evidence in the record of any of those facts, and that I think is appropriate under Rule 341 to point out with regard to this record. The evidence that is before this Court, with small exceptions of additional evidence that was in McClure, that evidence was insufficient in McClure in 1999, and it's insufficient now. McClure found that no reasonable jury could find that Owens, Illinois conspired under the applicable law. The allegation in McClure was that Owens, Illinois conspired with a series of companies, including Owens Corning, ABEX, Johns Manville, and Raybestos, Manhattan. In this case, in paragraph 9, after it was amended, the allegation is the same. Owens, Illinois allegedly conspired with Owens Corning, Johns Manville, ABEX, Raybestos, Manhattan. The Supreme Court was dealing with that same allegation. Mr. Wilder suggests that McClure is not important with regard to Owens, Illinois. He said that Gil and Water was the only decision that addressed Owens, Illinois, except, of course, for McClure. But McClure is a Supreme Court decision, and although it's from 1999, it's never been questioned. There's never been any doubt about whether or not it remains binding law. McClure does provide guidance to this Court. In McClure, the Supreme Court addressed the 1953 distribution agreement, in which Owens, Illinois and Owens Corning agreed that Owens, Illinois would manufacture the product and Owens Corning would distribute it. The Supreme Court didn't remand that case for further findings about whether or not the O-I-C relationship was important. They had all that information. The Supreme Court in McClure had the information that Owens, Illinois owned stock in Owens Corning even after 1958. Mr. Wilder points to a deposition of Owens, Illinois' then CEO in the early 2000s as evidence that was not in the McClure record. And that's true, it wasn't in the McClure record, but it's just more of the same. It's, first of all, unilateral conduct of Owens, Illinois. Everything that Mr. Lemier talked about, whether it was the manner in which Owens, Illinois operated their glass plants, the manner in which Owens, Illinois handled their asbestos control problem in the 1970s, asbestos control program, pardon me, in the 1970s, it's all unilateral. It doesn't add anything to the body of evidence that was in front of the Supreme Court in McClure. At most, it is additional parallel conduct, and we know that parallel conduct by itself is insufficient to support liability in a conspiracy case. The volume of parallel conduct doesn't make it any better. Lots of parallel conduct is insufficient to support conspiracy liability. A little bit of parallel conduct is insufficient to support conspiracy liability. And the only thing plaintiffs have added to the evidentiary record here that wasn't in McClure is additional evidence of unilateral and parallel conduct. That's simply not enough. Plaintiffs emphasized the Gillenwater decision, and I have a couple of things that I want to point out about Gillenwater. First of all, the holding of the Gillenwater decision is that Owens, Illinois is entitled to judgment as a matter of law. That was a jury verdict that was entered in favor of plaintiff against Owens, Illinois. There was an appeal. The J&OB was granted by the trial court, and the Fourth District affirmed the J&OB in favor of Owens, Illinois. So Mr. Wilder is urging here that this Court rely on Gillenwater to reverse a trial court's decision entering judgment for a lie. But in Gillenwater, the Court affirmed the entry of judgment for Owens, Illinois. There is dicta about the decision. The Fourth District talks about what inferences could be drawn during the 1953-1958 period during which the dissemination agreement was effective. And I will simply say that the exposure in both cases is after 1958, and we would ask that the Court affirm the judgment in favor of Hudson and enter judgment for Owens, Illinois. Thank you. Okay, please, the courts. Mr. Wilder. Reagan-Simpson for Apex. The issue here is not whether Apex can be sued for its own conduct. In Rodarmo, the paragraph 132, the Court said that Apex can be sued for its own initiative. The issue is whether Apex can be sued for the products and conduct of someone else under a conspiracy theory. And what Rodarmo held was it cannot because there is no evidence that Apex entered into an agreement to suppress the hazards of asbestos. And Rodarmo made that opening with the foundation of McClure. And there's a couple of things in McClure that I want to emphasize. First is the parallel conduct that's been mentioned. That's legally insufficient. Second, the Court reaffirmed that the elements of a conspiracy are an unlawful agreement and tortious conduct in furtherance of that agreement. That's the requirements for a conspiracy. Now, what we have in evidence is that there were a number of manufacturers many years ago that didn't warn about asbestos. That is parallel conduct. Under McClure, that is legally insufficient evidence of conspiracy. And when Mr. Wilder says, well, our agreement really is not warning about asbestos, there is no evidence of an agreement. It is all circumstantial. The argument here is, well, they all didn't warn. They must have agreed not to warn because of some other facts. And you can infer that. That's circumstantial evidence, and that's why a theory-convincing evidence standard applies. So the issue here is you have legally insufficient evidence that there's evidence that a number of manufacturers didn't warn. Is the decision made by some sponsors not to publish the 11 miles experiment, does that add anything to the legally insufficient evidence? And it doesn't, as courts across this State have held. In O'Donnell, the court summarized all this evidence, paragraph 41, saying it is utterly devoid. The 11 miles experiment is utterly devoid of scientific significance. The researcher, Dr. Gardner, said it had so many flaws it means nothing. That's at appendix page 122. And, in fact, as O'Donnell mentioned in paragraph 31 of this opinion, Dr. Gardner said, I don't even want to put cancer into this publication that's going to come out. So realize that we're being accused of suppressing information about asbestos that the researcher says means nothing and that he didn't want to publish. That's not any evidence of suppression of the hazards of asbestos. Dr. Gardner said that he did not want to keep – Dr. Gardner said it was better – He didn't want to put cancer into the – Yes. What he said was it's better to omit it because it's going to take a proper study. It's going to take me years to get 1,500 mice, have a control group, know the strength of the mice, know the age of the mice, and come up with a valid scientific experiment. In page – paragraph 41 – no, 31 of the O'Donnell opinion, the court says Dr. Gardner said cancer is not something I'm going to put into this article about asbestosis. He wasn't studying cancer. He was studying asbestosis. So that's the gist of the claim here, that we suppressed information that the researcher said means nothing. And not only the researcher but the National Cancer Institute, a panel of the National Cancer Institute, said it doesn't mean anything because of all the flaws, the no control group. You didn't know the tumor rate of the mice, spontaneous tumor rate. You didn't know the age. You didn't know the strength. There were so many flaws to this experiment. It doesn't mean anything. And the National Cancer Institute assumed that the tumors in these – some of these 11 mice was cancerous. But we don't even know that. As the Renardville opinion pointed out, based on the experimental notes that we have from Dr. Gardner, we don't even know, shrouded in ambiguity, whether these tumors were even cancerous to begin with. So the holding in Renardville is that publishing something that has no significance scientifically is not an unlawful reading and it's not cautious conduct. So it is meaningless in the context of the law or conspiracy just as it is meaningless in the context of scientific validity. And that's the essential holding in Renardville that other courts have been following. In the appellant's brief, they suggest there are a lot of language concerning the alleged conspirators' conspiracy not just to not publish something that would be harmful to their industry but also to edit the results of the scientific studies to remove any indication that asbestos leads to cancer. And they, if I'm understanding correctly, that's the suggestion where the conspiracy was is to alter those findings and to make sure that it never comes out that asbestos could, in fact, lead to cancer. It's not so much whether or not it was published as opposed to what was published. They're going to edit it for the scientific factors themselves. How does that not go to a conspiracy? If I may, there's rhetoric to that extent in the briefing by the other side. What Dr. Garker... There's a couple of those years it was short. I like reading both of them. Both of them are very well done. Totally two different volumes. Dr. Garker was studying asbestosis. That was the title of the article that came out later on after his death, asbestosis. He wasn't studying cancer. The only thing that they can point to... I mean, all of this was published in a big article later on about asbestosis. The only thing they point to that wasn't published by Dr. Garker is the 11 mice experiment, that 11 mice... We don't know the strain. We don't know the age. We don't know the tumor rate. We don't have a control group. And some of them had tumors that may have been cancerous. And so that is the only thing that's not published. And so that's not a decision to edit something. That is a decision that this is not scientifically valid. And there is a proper... In fact, going back to Judge Procasco, who was in the Winnebago County, one of the many summary judgments he got, what he said there was because ABEX didn't have notice that this was valid science. In fact, ABEX had notice of the opposite. If you look at ABEX 748, Vanderbilt Brown talked about it. Dr. Gardner thought this should be a subject of some other study. He had flaws in this. That's what the notice ABEX had. And so ABEX would assume that it is proper not to publish that. And also realize, and this is another thing that was mentioned by one of the many judges who's considered this, this is Judge Drummond in the Bones case. And that's in exhibit G to my affidavit. If you want to look at that, it's kind of hard to cite it because it's in this supplemental record. But it has a number of opinions by other judges who've looked at this case and reached conclusions. And Dr. Hamlin didn't see anything wrong with publishing this. He said it's already in the literature. So ABEX was not there saying we can't publish this. ABEX didn't insist on publishing it. But it didn't say we shouldn't publish it. Here's what Judge Drummond says in the Bones case. The bottom line is Dr. Hamlin did not see anything about the experiment that caused him concern, stated much of what was found was already known, and said he was too busy to attend the meeting to decide about publication. None of this suggests an agreement by ABEX and, in fact, points to the opposite conclusion. And when you read this in context of the other evidence, if you look at pages 50 through 58 of our appendix, you'll see that there were no instances of asbestosis at ABEX. Any time Dr. Hamlin was there, he published about asbestosis, including sending it to people like the Illinois Department of Health, killing insurance companies, looked at the facts, and decided that there was not an asbestos hazard at ABEX at different times. So the whole context of this is adverse and contrary to the idea that ABEX was involved in the conspiracy. Dr. Lynch was mentioned by ABEX, ABEX 711, that Dr. Lynch somehow blesses this as being scientifically valid. We put into evidence two articles by Dr. Lynch. At the appendix, pages 246 to 65, Dr. Lynch commented about Dr. Gardner's research and said it didn't show that there was any evidence that asbestos causes cancer and talked about the flaws in Dr. Gardner's research. So what we have here is a claim that we engaged in conspiracy to not publish something that was not valid in science, and that is not an unlawful agreement to publish something that is meaningless and is not tortious conduct. So it doesn't enter into the calculus of whether there's sufficient evidence of conspiracy. It doesn't add anything to the legally insufficient parallel conduct. The only difference in the record here and other than Lynch, the only other thing I was going to say is that we cited in our brief a number of reasons why Dr. Frank should not be considered in the Ellis case. Judge Mim in Peoria held that it was junk science, and so did Judge Lawrence, the first judge who considered that. Thank you. Mr. O'Allen. Conspiracy allegedly did not tell people. One of your questions did not tell people. Suppression of the results from Cerenac, whether there's cancer or not cancer, is evidence that it wasn't an accident, that they all knew and didn't tell. That's some of the evidence over and beyond parallel conduct. And Gardner said... But they're suggesting, though, that there's nothing for them to tell, right? We have an expert who says, who's in the record and who's published and who's qualified, that the fact that it caused new growth would have been of significance, whether it was tumor or not tumor. As far as he says the only thing it took out was, well, 8 of 11 mice got cancer, according to Gardner. Actually, they added it in the report. The report in 48 said that complications... In addition to that, some complications included infection and malignancies. And they made them take out the words and malignancies. And the way they did that, it was 37 to 39. They excised anything that said tumor or malignancies and then said this is the full and complete report when it was published in 51, and the concern only asked asbestos. Gardner, in his letter in February of 43, or March of 43, with his outline, where he's got it in his outline, his proposed monograph, says to the attorney at Manville, this issue of cancer susceptibility is of more significance. I think it will take two or three years, so it might be better to be omitted from this report so I can get the funding for another study. He was already eight years overdue on his results, and they were pushing him, and that's why he went elsewhere to attempt to get the funding. So he had in his proposed monograph that was suggestive but not conclusive. And that's what the head attorney for Manville said. This can be dynamite. And what even in the Darwin, paragraph 124, it didn't read at all, but basically how the Darwin gets around Burgess is to say, well, you know, first of all, it's an unreasonable inference that they took it up for their own motives. It could have caused some problems because there was a dispute going on at that time about whether asbestos caused cancer. But the conspiracy is they kept exposing and kept telling. And, in fact, this is one article as an example that they agreed was an agreement. What did Avex know? Hamlin's November 3, 1948 memo is placed into the 360B. That's when he reviews the report and says, I don't see anything of concern here. It appears the Manville attorney is concerned about lethal repercussions from this. And he concludes by saying, I don't want to go to New York corporate boardroom. I think he can adequately protect our interests. Now, that's not an agreement between two companies. When the medical director of the one says, it's in the literature, and the evidence is that what's in the literature by then is 80 to 90 articles saying it causes cancer and says what looks to me like is the attorney is concerned about lethal repercussions if this comes out in the study. When we, the industry, is funded, the attorney will protect our interests, the attorney from another company. I suggest that's evidence over and beyond parallel conduct, as did Burgess Wood. Going to the Owens of Illinois, I'm not suggesting clear and convincing can't apply at the summary judgment level. I said it shouldn't apply as to Avex because Avex is not based solely on parallel conduct. Avex is based on direct evidence over and beyond parallel conduct, including the editing of the Saramac results. I mean, it's been true, I think we all cited, or somebody must have cited the Ray Dancer case, where it says that on summary judgment you can use clear and convincing, but the issue is could a reasonable juror, considering all the inferences in favor of the non-movement, could a reasonable juror find that even under a clear and convincing standard, which is sort of ill-defined what it is, could they possibly find for the non-movement? If they can, it would be a nice summary judgment. The defendants, in this case, coupled that with saying, well, if it's clear and convincing, then you also have to apply the innocent construction rule, and the innocent construction rule, as defendants would have it, would be that you must pick the one inference that could be innocent. That's not what the innocent construction rule is, and if you did that, it's directly contrary to summary judgment practice. McClure did not consider OIOC. That's page 150 in McClure, but expressly say that that relationship wasn't of importance in McClure. Mr. Fisher said there's no facts to support what they're alleging here. Look at paragraph 96 of Yellowwater, where they lay out the distributor agreement and say that even under a clear and convincing standard, OIOC was conspiring. The issue, he says, did it end at 58, as Justice Appleton said, and he said, no, there's more evidence here about why it was important to Hawaii to continue to have asbestos on the market. Thank you. All right, we will take this under advisement and do a rule-in-deployment. We're going to take a very short recess.